IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2005

## STATE OF TENNESSEE v. CURTIS PALMER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-04188     James C. Beasley, Jr., Judge**

**No. W2004-01748-CCA-R3-CD  - Filed December 9, 2005**

Following a jury trial, Defendant, Curtis Palmer, was convicted of first degree felony murder in the perpetration of aggravated burglary in count one of the indictment and first degree felony murder in the perpetration of theft of property in the second count, and was sentenced to life imprisonment without the possibility of parole.  The trial court merged Defendant's conviction for felony murder in count two into his conviction for felony murder in count one.  In his appeal, Defendant argues (1) that the evidence is insufficient to support his conviction on the charge of felony murder; (2) that he was denied his right to a speedy trial; (3) that the trial court erred in denying his motions to suppress; (4) that the trial court erred in its evidentiary rulings; (5) that the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense of the charged offenses; and (6) that the prosecution engaged in prosecutorial misconduct during closing argument.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES, J., joined. JOSEPH M. TIPTON, J., filed a concurring opinion.

Mark Mesler, Memphis, Tennessee, for the appellant, Curtis Palmer.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; Phillip Gerald Harris, Assistant District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I.  Trial

Patrice Johnson and the victim, Patricia Miller, were friends and worked together at the Regional Medical Center in Memphis.  Ms. Johnson said that she received a call from the medical

center on January 1, 2002, because the victim had not reported to work that morning. Concerned, Ms. Johnson drove to the victim's home and found a door near the carport cracked open. Ms. Johnson called the police. Officers found the victim dead inside her home.

Carmalita Harris, the victim's daughter, said she stayed with a friend on New Year's Eve and spoke with her mother by telephone around 12:45 a.m. on January 1, 2002. Ms. Harris said that the victim owned three car speakers and an amplifier which she was attempting to sell. The speakers were white, black, and red, and the material on the face of one of the speakers was torn. Ms. Harris identified the speakers found in Defendant's car as her mother's.

Ms. Harris said she inspected her bedroom after the victim was discovered. She found various items on her bed which were not there the day before, and a bullet hole in the ceiling. Her bedroom window was raised, and the air conditioner had been removed.

Officer Willie Mathena with the Memphis Police Department responded to the call from Ms. Johnson. Officer Mathena found the victim lying on the floor in the den. In Ms. Harris' bedroom, Officer Eric Freeman found a "bullet strike" on a bedside table, and noticed that the air conditioner had been taken out of the bedroom window. There was a bullet hole in the ceiling. A bullet fragment was found near the victim, and a second bullet fragment and three shell casings were found in the den.

Sergeant Gerald Crowson and Sergeant Todd Pierce, with the Southhaven, Mississippi Police Department, observed Defendant drive his Chevy Caprice into a Blockbuster parking lot around 6:00 p.m. on January 1, 2002. Defendant went inside the Blockbuster store. Sergeant Pierce asked Defendant to step outside the store so he could ask him a few questions. Sergeant Pierce said that Defendant was cooperative. Sergeant Crowson looked in a window of Defendant's car and noticed a two-tone, small caliber semiautomatic pistol lying on the floorboard of the driver's side of the car.

Officer Danielle McKenzie, with the Horn Lake, Mississippi Police Department, was dispatched to the scene. She read Defendant his *Miranda* rights. Officer McKenzie said that Defendant told her he did not "understand what an attorney was." Officer McKenzie explained the role of an attorney and said that Defendant appeared to understand. Officer McKenzie said that the officers discovered three car speakers and an amplifier in the trunk of Defendant's vehicle.

Sergeant Nathan Berryman with the Memphis Police Department said that one of the victim's friends told him she had spoken with the victim on the telephone around 10:30 p.m. on December 31, 2001. The victim told her friend that she had another call coming in and put the friend on hold. When the victim returned to the line, she told the friend that she needed to speak to the man on the other line about selling him her car speakers and amplifier. Defendant was identified as the caller from the victim's telephone caller identification box.

Sergeant Berryman said that Defendant's aunt called the police department on January 2, 2002, and informed them that Defendant had been incarcerated in Mississippi. Sergeant Berryman

and Sergeant Gossett traveled to Hernando, Mississippi, and began interviewing Defendant at approximately 5:00 p.m. Defendant was read his *Miranda* rights and signed a waiver of those rights. Sergeant Berryman said that Defendant was calm and appeared to understand his rights. After offering different versions of how he had gained possession of the speakers found in the trunk of his car, Defendant told Sergeant Berryman, "I messed up, didn't I." Defendant asked to speak to Sergeant Berryman alone and implicated himself in the commission of the homicide of the victim. Sergeant Berryman read Defendant his *Miranda* rights a second time around 6:30 p.m., and Defendant gave a written statement which was read to the jury during the trial.

In his statement, Defendant said that he met the victim a few days before Christmas, and she told Defendant she had three car speakers and an amplifier for sale. Defendant said that while he was trying to raise the cash to buy the equipment, he and the victim began seeing each other socially. Defendant said he called the victim several times on December 31, 2001, but did not get an answer. He went to the victim's home "about eight something that night and parked in the driveway." The victim did not answer the door when he knocked and rang the doorbell. Defendant said he went to the back of the house and took an air conditioner out of one of the windows. He heard the victim call out, "Who's there." Defendant said he ran away but decided to go back. He jumped through the open window in the back of the house. He said the victim walked away from him saying, "I'm fixin[g] to blow yo[ur] ass off." Defendant said he shot the victim five or six times with a .380 caliber handgun. Defendant retrieved the victim's car speakers and amplifier from a room in the victim's house and put them in the trunk of his car. Defendant said that the victim was still breathing when he left. Defendant said he drove to Mississippi after stopping at a store to buy beer, and asked a friend to hook up the speakers and amplifier in his car.

On cross-examination, Sergeant Berryman said that the shell casings found at the victim's home were .380 caliber. He said that different kinds of weapons were capable of firing .380 caliber bullets.

Dr. Teresa Allen Campbell stated that she was a forensic pathologist and performed an autopsy on the victim on January 2, 2002. Dr. Campbell said that the victim died as a result of multiple gunshot wounds. Dr. Campbell said that the absence of soot or gunpowder on the victim's clothing indicated that the shooter was standing more than two feet away from the victim when the weapon was fired. One bullet penetrated the victim's upper right back causing the right lung to hemorrhage and collapse. Dr. Campbell said this wound was sufficient to cause death, although the victim could have possibly recovered from this wound if she had received immediate medical treatment. A second bullet entered the victim's body in the middle of her back, traveled through her body, and pierced her abdominal wall. Dr. Campbell said this wound was also sufficient to cause death. Dr. Campbell said that there was not a lot of bleeding associated with the abdominal wound because she believed that the victim had already expired from the chest wound. Two other bullets caused superficial wounds to the victim's back and upper leg.

## II. Sufficiency of the Evidence

Defendant does not contend that he did not kill the victim. Defendant argues, however, that the evidence was insufficient to support a finding that the victim was shot during the perpetration of a theft or burglary. In support of his argument, Defendant refers to several inconsistencies in his statement. For example, Defendant said in his statement that he arrived at the victim's house around 8:00 p.m. on December 31, 2002. The victim's daughter, however, testified that she last spoke with her mother around 12:45 a.m. on January 1, 2002. At one point in his statement to the police, Defendant said that the victim was lying down on the bed in her daughter's bedroom when Defendant entered the house. At another point in the statement, Defendant recalled that the victim "rosed [sic] up from the floor beside the bed." Defendant argues that this inconsistence "makes no logical sense."

Defendant argues that the fact that he went with his friend to get a refund on his car speakers so he could buy the victim's speakers, that he parked in the victim's driveway that night, and that he repeatedly rang the door bell indicates that he did not go to the victim's house with the intent to steal her speakers.

However illogical Defendant's statement appeared at times, his challenge to the sufficiency of the evidence addresses matters left to the jury for resolution. In examining whether the evidence is sufficient to support Defendant's conviction of first degree felony murder, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

First degree felony murder, as relevant here, is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2). Aggravated burglary is the burglary of a habitation. *Id.* § 39-14-403(a). "A person commits burglary who, without the effective consent of the property owner . . . enters a building and commits or attempts to commit a felony, theft or assault." *Id.* § 39-14-402(a)(3). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

Defendant said in his statement that he and the victim discussed his purchasing the victim's car speakers and amplifier during the days immediately before New Year's Eve. The caller identification box on the victim's telephone showed that the victim spoke to someone from a telephone number listed in Defendant's name around 10:30 p.m. on December 31, 2002. The victim told another caller that the telephone call was from the man who wanted to buy her car stereo equipment. Ms. Harris said that she last spoke with her mother at approximately 12:45 a.m. on January 1, 2002. Defendant said that he entered the victim's home by removing the air conditioner from a window in the back of the house. Defendant said that he walked behind the victim after she had confronted him and repeatedly shot at her. He took the victim's speakers and amplifier from the house, placed the equipment in the trunk of his car, and drove to Mississippi. Ms. Harris identified the car speakers and amplifier found in the trunk of Defendant's car as the victim's.

Viewing the evidence in a light most favorable to the State, and leaving the resolution of any inconsistencies to the jury, we conclude that a rational trier or fact could conclude beyond a reasonable doubt that Defendant committed the offense of first degree felony murder during the perpetration of a burglary and theft. Defendant is not entitled to relief on this issue.

## III. Motions to Suppress

Defendant argues that the trial court erred in denying his motions to suppress the evidence obtained during a search of his car and in his statement to the police.

At the suppression hearing, Sergeant Pierce testified that he received a bulletin at approximately 5:15 p.m. on January 1, 2002, to be on the look out for a black Chevrolet or Ford with shiny rims around the hubcaps. The dispatcher described the driver as a male African-American with corn rows in his hair, and he was accompanied by a Hispanic male and a child. The dispatcher said that the suspect was armed and was wanted in connection with an armed robbery at a Sonic Restaurant in Horn Lake, Mississippi. Another officer spotted a car and driver matching this description, and Sergeant Pierce responded to the officer's request for back-up. Sergeant Pierce said that Defendant pulled his Chevrolet Caprice into a parking lot and went inside a Blockbuster store. Defendant was the only person in the car.

Sergeant Pierce entered the store and asked Defendant to step outside. Defendant identified himself and said that he was driving the Caprice. Sergeant Pierce patted down Defendant but did not find a weapon. He said that Sergeant Crowson arrived and walked over to Defendant's car. Sergeant Crowson told Sergeant Pierce that there was a gun in the car. Sergeant Pierce arrested Defendant and handcuffed him. He did not read Defendant his *Miranda* rights and did not question him further.

Sergeant Crowson said that he used a flashlight when he looked inside Defendant's car. He saw a small caliber, semiautomatic pistol in the floorboard, lying partially beneath the driver's seat. He also saw cups and paper bags with the Sonic label. Sergeant Crowson said that he and Sergeant Pierce did not question Defendant because the armed robbery was not their case. Sergeant Crowson

identified the gun in Defendant's car as a .380 caliber pistol. Sergeant Crowson said he did not search the interior of Defendant's car.

Officer McKenzie brought the victims of the armed robbery to the parking lot where Defendant was detained. The victims identified Defendant as their assailant. Officer McKenzie arrested Defendant and read him his *Miranda* rights. Officer McKenzie said Defendant told her he did not know what an attorney was. Officer McKenzie explained that an attorney would be the person who would help him in his defense. Defendant said he understood, and Officer McKenzie read Defendant his *Miranda* rights again. After Defendant was arrested, his accomplice, Robert Snow, was detained as he came out of a nearby K-Mart.

Officer McKenzie searched Defendant's car and saw paper bags with the Sonic logo and a black and silver gun that was partially beneath the driver's seat. Officer McKenzie also opened the car's trunk because one of the victims said that just before she was robbed, Mr. Snow was leaning into the trunk "messing with something in the trunk" while Defendant stood nearby. Officer McKenzie saw a box of car speakers in the trunk.

Defendant gave a written statement at approximately 7:53 p.m. admitting his involvement in the armed robbery in Horn Lake, Mississippi.

Officer McKenzie said that a detective from the Memphis Police Department called her the next morning and asked whether the Horn Lake Police Department had Defendant in custody. Officer McKenzie confirmed Defendant's incarceration. In response to the officer's questions, she described the pistol and speakers that were found in Defendant's car. After the Memphis detectives arrived, Officer McKenzie prepared a search warrant for Defendant's car. The warrant was signed by a municipal city judge who happened to be at the police station.

Detective Scott Evans with the Horn Lake Police Department testified that he sat in as an observer during Defendant's interview by the Memphis police officers. Officer Evans said he remembered that Defendant was read his rights and that he signed a written waiver. Officer Evans did not remember whether or not Defendant requested the presence of an attorney. He described Defendant as calm, quiet and "laid back." Detective Evans believed Defendant's interview began around 3:00 p.m. on January 2, 2002.

Sergeant Berryman said that he spoke with Detective Evans and Officer McKenzie when he arrived in Horn Lake, Mississippi, on January 2, 2002. Officer McKenzie confirmed that the pistol found in Defendant's car was a .380 caliber handgun.

Sergeant Berryman also had a description of the speakers which were the only thing identified as missing from the victim's home. Sergeant Berryman interviewed Mr. Snow and his girlfriend, December Powell, before he interviewed Defendant. Both said that Defendant arrived at Mr. Snow's house in the early morning hours of January 1, 2002, with some car speakers in his trunk and asked Mr. Snow to install them. Their description of the speakers matched the description of

the victim's speakers. Mr. Snow said Defendant paid him $50.00 to install the speakers in his car. Sergeant Berryman said he obtained a search warrant for Defendant's car after he interviewed Mr. Snow and Ms. Powell and found speakers matching the description of the victim's speakers in the trunk of the car.

Sergeant Berryman and Sergeant Gossett began questioning Defendant about the victim's murder around 5:00 p.m. Sergeant Gossett read Defendant his *Miranda* rights, and Defendant signed a written waiver. Sergeant Berryman said Defendant gave two or three versions as to how he acquired the speakers. Sergeant Berryman said Defendant stopped talking and asked if he could speak with Sergeant Berryman alone. Sergeant Gossett left the room. Defendant then described the sequence of events leading up to the shooting of the victim. Sergeant Gossett rejoined the interview, and Defendant was again read his *Miranda* rights. Sergeant Gossett began typing Defendant's statement at 6:30 p.m. Defendant read over the statement, made a few corrections, and signed the statement at 9:40 p.m. Sergeant Berryman said that Defendant's demeanor during the interview was "calm, quiet spoken," although he cried at one point.

On cross-examination, Sergeant Berryman said that no one threatened Defendant. Sergeant Berryman said that Defendant did not ask to speak to a lawyer or his mother during the interrogation.

Sergeant Gossett confirmed that Defendant was read his *Miranda* rights before the interview began at 5:00 p.m. and again before Sergeant Gossett began typing Defendant's statement at 6:30 p.m. Sergeant Gossett said that Defendant asked to speak to Sergeant Berryman alone because Defendant had built up a rapport with him. On cross-examination, Sergeant Gossett said that neither he nor Sergeant Berryman made any promises to Defendant in exchange for him giving the statement.

A. Search of the Vehicle

The trial court found that the Southhaven police officers had probable cause to detain Defendant based on the information dispatched by the Horn Lake Police Department concerning the armed robbery at the Sonic Drive-In. The trial court found that the gun was in plain view in Defendant's car. Following the victims' identification of Defendant as the perpetrator of the armed robbery, the trial court found that Officer McKenzie had probable cause to arrest Defendant and to search his car prior to its impoundment. The trial court noted that Defendant did not challenge the validity of the search warrant subsequently issued for Defendant's car, and that the speakers in the car's trunk were properly discovered during the execution of the warrant.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from

that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

Defendant argues that the warrantless search of his vehicle by the Mississippi police officers did not fall within any of the limited exceptions to the warrant requirement, and that the evidence discovered by Officers Crowson and McKenzie should be suppressed.

"Under both the United States and Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable." *State v. Smith*, 21 S.W.3d 251, 254 (Tenn. Crim. App. 1999) (citations omitted). "Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless that search or seizure was conducted pursuant to one of the recognized exceptions to the warrant requirement." *Id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

One of these exceptions is the plain view exception which applies when a seized item is in "plain view" from a lawful vantage point of the officer who conducts the search. *See Harris v. United States*, 390 U.S. 234, 236, 88 S. Ct. 992, 993, 19 L. Ed. 2d 1067 (1968). The plain view exception requires proof that the officer "did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," that the evidence was in plain view, and that the incriminating nature of the evidence was immediately apparent. *Horton v. California*, 496 U.S. 128, 136, 110 S. Ct. 2301, 2308, 110 L. Ed. 2d 112 (1990).

Officer Crowson had information that the suspect matching Defendant's physical description and driving a similar car was armed. Officer Crowson testified that Defendant's car was parked in a public parking lot, and that Defendant's gun, while partially beneath the driver's seat of Defendant's car, was visible from Officer Crowson's vantage point from the driver's side window. Officer McKenzie, also armed with information from the victims that a gun had been used to commit the robbery, testified that Defendant's gun was partially visible from the window. As recognized by the Supreme Court in *Payton v. New York*, 445 U.S. 573, 586-87, 100 S. Ct. 1371, 1380-81, 63 L. Ed. 2d 632 (1980), "objects such as weapons or contraband found in a public place may be seized by the police without a warrant. The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Based on our review, the seizure of the gun in Defendant's car by the Mississippi police officers was proper under the plain view exception to the warrant requirement. Moreover, because a gun was discovered in plain view in Defendant's car, the police officers had probable cause to search Defendant's entire vehicle, including the trunk. *United States v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982). Defendant is not entitled to relief on this issue.

B. Suppression of Defendant's Statement

Defendant argues that the trial court erred in not suppressing his statement to Sergeant Berryman because the statement was the result of physical or psychological coercion. *See Rogers v. Richmond*, 365 U.S. 534, 540-541, 81 S. Ct. 735, 740, 5 L. Ed. 2d 760 (1961). Defendant also contends that the testimony presented at the suppression hearing left unresolved "legitimate questions" as to whether Defendant understood his *Miranda* rights or whether he requested the assistance of an attorney during the interrogation. The trial court found that both the Memphis and Mississippi police departments properly advised Defendant of his *Miranda* rights on several occasions, that Defendant said he understood those rights, and that he freely and voluntarily waived those rights.

"[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996), (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 2d 568 (1897)). The totality of the circumstances surrounding the giving of the statement must be examined. *See State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense. Rather coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Smith*, 933 S.W.2d at 455 (citations omitted).

Defendant does not point to any examples of what he perceives to be coercive police activity during his interrogation. Sergeant Berryman and Sergeant Gossett testified that no promises or threats were made during the interview, and Defendant did not request the assistance of an attorney. The officers said that Defendant was calm during the interview. Defendant was read his *Miranda* rights before the oral interview and before Sergeant Gossett began typing his statement. Defendant made corrections to the statement and signed it. Based on our review of the record, we conclude that the evidence does not preponderate against the trial court's finding that Defendant's statement was voluntarily given to police.

## IV. Speedy Trial Issues

Relying on *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), Defendant argues that the trial court erred in not dismissing the charges against him because his Sixth Amendment right to a speedy trial was violated. Defendant was indicted by the Shelby County Grand Jury on June 24, 2003, for the victim's murder. Defendant was extradited to Tennessee from Mississippi where he was in custody for charges arising out of the armed robbery in Horn Lake. Defendant was arraigned on the Tennessee charges on September 24, 2003, and his trial commenced April 26, 2004.

Defendant contends that his right to a speedy trial was triggered when the Memphis police officers interviewed him in Mississippi on January 2, 2002, although he was not charged with the

Tennessee offenses until his indictment in June 2003. Defendant argues that the delay of approximately twenty-seven months between the giving of a statement to the Memphis police officers, and his trial on the charges, was "presumptively prejudicial" and hindered his ability to present a defense.

The State argues that the date of the indictment, not his initial interview with the Memphis police officers, triggered Defendant's right to a speedy trial. Defendant was extradited and arraigned in Shelby County on the current charges in September 2003, and Defendant asserted his right to a speedy trial by a *pro se* motion filed in September 2003, and a motion to dismiss filed by his appointed counsel in December 2003. Defendant's trial commenced April 26, 2004. The State argues, therefore, that the approximately ten months delay between the date of the indictment and Defendant's trial was not presumptively prejudicial.

At the hearing on Defendant's motion to dismiss, the prosecutor said that the district attorney's office received Defendant's file in January 2002. Initially, no action was taken pending receipt of test results from the T.B.I. The State acknowledged, however, that the bulk of the delay was caused by oversight or inadvertence. The prosecutor stated that as soon as he discovered that Defendant's file had not been acted upon, he submitted the case to the grand jury on June 24, 2003.

The trial court found that although part of the cause of the delay rested with the district attorney's office, there was no indication that Defendant had been prejudiced. Defendant was incarcerated in Mississippi until he was arraigned on the current charges in Tennessee. The testimony of Mr. Snow and Ms. Powell was preserved in statements, and the trial court found that Defendant did not show that he was in any other way prejudiced by the delay.

The Sixth Amendment to the United States Constitution, as well as the Tennessee Constitution, guarantees those accused in a criminal prosecution the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. Art. I, § 9; *see also* Tenn. Code Ann. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial . . . ."). "The speedy trial guarantee is designed to protect the accused from oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that the accused's defense will be impaired by dimming memories or lost evidence." *State v. Simmons*, 54 S.W.3d 755, 758 (Tenn. 2001) (citing *Doggett v. United States*, 505 U.S. 647, 654, 112 S. Ct. 2686, 2692, 120 L. Ed. 2d 520 (1992); *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997)).

"Generally, post-accusation delay must approach one year to trigger a speedy trial inquiry." *Simmons*, 54 S.W.3d at 759 (citing *Doggett*, 505 U.S. at 652 n.1, 112 S. Ct. at 2691 n.1; *Utley*, 956 S.W.2d at 494). The length of delay that will trigger a speedy trial analysis depends upon the peculiar circumstances of the case, and the "reasonableness of the delay depends upon the complexity and nature of the case." *Barker*, 407 U.S. at 530-531, 92 S. Ct. at 2192; *Simmons*, 54 S.W.3d at 759. If this threshold is crossed, *Barker* outlined a four-factor balancing test for courts to apply in evaluating the merits of a speedy trial claim based on (1) the length of the delay; (2) the reason of the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice

suffered by the defendant. *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192; *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973).

When an accused seeks the dismissal of charges based upon the denial of a constitutional right to a speedy trial, he or she must establish a period of delay that is "presumptively prejudicial." *Simmons*, 54 S.W.3d at 759. Our initial inquiry, then, is which State action in the instant case triggered a speedy trial analysis for the purpose of determining whether or not the delay was "presumptively prejudicial." Both the provisions of the United States Constitution and the Tennessee constitution "apply, by their own terms, to persons 'accused' in a 'criminal prosecution.'" *State v. Wood*, 924 S.W.2d 342, 345 (Tenn. 1996). "Clearly, to be an 'accused' one must be faced with a 'formal accusation'" such as a formal indictment, information or arrest. *Id*; *see also United State v. Marion*, 404 U.S. 307, 313, 92 S. Ct. 455, 459-60, 30 L. Ed. 2d 468 (1971); *State v. Baker*, 614 S.W.2d 352, 353 (Tenn. 1981).

In *Utley*, an arrest warrant was issued for the defendant in 1987, but he was not served with the warrant until June 1992. *Utley*, 956 S.W.2d at 491. An indictment was returned in September 1992, and in December 1992, the defendant moved for the dismissal of the charges against him on a speedy trial claim. *Id*. The defendant's motion was granted in February 1993, and the State appealed. *Id*. In *Utley*, the Court concluded that an arrest "warrant alone does not trigger speedy trial analysis; to the contrary, a formal grand jury action or the actual restraints of an arrest are required." *Id.* The Court concluded that a delay of eight months in bringing Defendant to trial after he was indicted in 1992 was not presumptively prejudicial under *Barker* without addressing the remaining factors. *Id.*

In the case *sub judice*, the triggering event for speedy trial purposes under *Utley* was Defendant's indictment for the current charges in June 2003, not his initial interview with the Memphis police on January 2, 2002. After his indictment, Defendant was arraigned in September 2003, and his trial commenced April 26, 2004, approximately ten months after he was indicted. The length of the delay in the instance case was not presumptively prejudicial under *Barker v. Wingo*. Based upon our review of the record, we conclude that Defendant's right to a speedy trial was not violated.

We note that Defendant focused his speedy trial argument at the motion hearing and in his brief primarily on the delay which occurred between the commission of the crime and his indictment. The trial court found that the delay between the commission of the crime and Defendant's trial did not violate Defendant's Sixth Amendment rights under the guidelines of *Barker v. Wingo*. Although a delay between the commission of a crime and the commencement of adversarial proceedings does not violate an accused's right to a speedy trial, it may raise due process concerns. *State v. Carico*, 968 S.W.2d 280, 284 (Tenn. 1998) (citing *State v. Gray*, 917 S.W.2d 668, 671 (Tenn. 1996)).

Where the State has knowledge that a crime has been committed, and there is a delay in bringing charges, the accused must show that "'(a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to

gain tactical advantage over or to harass the accused'" in order to get relief based on a pre-accusation delay. *Gray*, 917 S.W.2d at 671 (quoting *State v. Dykes*, 803 S.W.2d 250, 255 (Tenn. Crim. App. 1990)).

Clearly, the State was aware that a crime had been committed in the instant case. Defendant gave a statement implicating himself in the commission of the crime on January 2, 2002. He was not indicted, however, until June 2003, a delay of eighteen months. During that time, Defendant was incarcerated in Mississippi on an unrelated armed robbery conviction. The State acknowledged that its failure to bring the case to the Shelby County Grand Jury before June 2003 was a matter of oversight, and Defendant has offered no evidence otherwise that the State caused the delay to gain a tactical advantage. Defendant also did not contend that he was denied the benefit of witnesses who became unavailable or that evidence was lost during the delay. Thus, absent any evidence that the State's pre-accusation delay was intentional, or that Defendant suffered actual prejudice as a result of the delay, any failure on the part of the trial court to address Defendant's pre-accusation delay in terms of a due process claim rather than a speedy trial claim does not rise to the level of reversible error.

## V. Prior Bad Acts

Defendant argues that the trial court erred in allowing Officer McKenzie and Sergeant Berryman to mention during their testimony Defendant's arrest in Mississippi on an unrelated charge. Defendant contends that this testimony was unfairly prejudicial and placed before the jury evidence of Defendant's other crimes in violation of Rule 404(b) of the Tennessee Rules of Evidence.

Prior to the impanelment of the jury, and out of the presence of the jury, the State initiated a discussion in open court concerning the problems associated with Defendant's initial detention in Mississippi which ultimately led to the discovery of the victim's car speakers:

> [STATE]: There is one matter that's going to come up, Your Honor. We need to address it. Because of an arrest in Mississippi . . . it is cogent and very relevant in the case relative to the issue of guilt, possession of stolen property. We're going to have to put officers on from two agencies in Mississippi, both the Horn Lake Police Department and the Southhaven Police Department. I have talked to these officers this morning. As the Court knows, they talked or they testified in the motion to suppress. I have told them and told them and told them that I'm going to lead them, and they are to use words like . . . "detain," not "arrest" because of the problem of the other case. . . . And I think we can skirt around that, but I think when

-12-

it comes time to put that on, that it might be helpful if the Court reminded all three of them . . .

[THE COURT]:          All right.

Defendant did not object to the relevancy of the testimony concerning his detention in Mississippi on January 1, 2002. Defendant argues, however, that the State's questioning during its case-in-chief improperly elicited information from the witnesses beyond a mere reference to a detention.

On cross-examination, defense counsel asked Officer McKenzie if she took Defendant's statement when she transported him to the police station, and Officer McKenzie responded, "yes." On redirect examination, the prosecutor asked:

[PROSECUTOR]:          The statement that you took from him at that time did not relate to any crime in Memphis?

[OFFICER MCKENZIE]:     No, sir.

[PROSECUTOR]:          All right. It was about another unrelated matter?

[OFFICER MCKENZIE]:     Correct.

During his direct examination, Sergeant Berryman explained that the reason the Memphis Police Department could not initially find Defendant "was because he was incarcerated in Mississippi, had got locked up that night." Sergeant Berryman said that Defendant's interview took place in the "DeSoto County Sheriff's Office which is the jail" because Defendant had been moved from Horn Lake to Hernando, Mississippi.

Defendant's statement was read to the jury. It included the following:

[SERGEANT BERRYMAN]:          Were you arrested in Southhaven, Mississippi on January the 1st, 2002 at approximately 6:00 p.m.?

[DEFENDANT]:                  Yeah, at Blockbuster by Wal-Mart.

At the close of his direct examination, Sergeant Berryman said that he did not take Defendant into custody at that time but "left him in Hernando."

At this point, defense counsel requested a bench conference.

| [DEFENSE COUNSEL]: | Your Honor, I was looking for a breaking point, but it never really came. I want to object. Several times questions were asked that were not necessary, like the last one, the most recent one, "Did you leave him there in Hernando or did you bring him back with you?" I think that creates an improper inference in front of the jury. Another question was asked early in the conversation, and again, I didn't want to stand up in the middle and bring it the jury's attention, but – so he was being detained – he'd already been transferred from [DeSoto] County to Hernando or from Hernando to [DeSoto]. And those are again irrelevant and just questions — |
|---|---|
| [THE COURT]: | (Indiscernible.) |
| [DEFENSE COUNSEL]: | Okay. But I just want to state that for the record. Again, I think had I jumped up and raised the objection at the time, that it would have, you know — |
| [THE COURT]: | Well, I think it's obvious from the testimony that he was being detained by the Mississippi authorities. Now, I can give them a curative instruction, if that's what you want me to do – |
| [DEFENSE COUNSEL]: | It's just that you don't have to do it now. . . . I guess with the other instructions if you don't mind. Again, my fear is that if you give it now, it's calling too much attention to it so to speak. |

Defense counsel subsequently approved the trial court's proposed instruction to the jury as follows:

> Members of the jury, there has been mention of an incident involving [Defendant] in the State of Mississippi. Whether or not [Defendant] had any problems in the State of Mississippi [is] not for your consideration and that should not have any bearing on your verdict in this case.

Initially, we address the State's contention that Defendant argues for the first time on appeal that the admission of certain portions of Officer McKenzie's and Sergeant Berryman's testimony concerning his "detention" violated Rule 404(b)'s proscription against propensity evidence of other crimes. *See* Tenn. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.")

Although evidence concerning Defendant's arrest for armed robbery in Mississippi constitutes evidence of "other crimes" as contemplated by Rule 404(b), Defendant's objection at trial and in his motion for new trial was based on the prejudicial nature of the testimony, not Rule 404(b). Because Defendant did not request a hearing under Rule 404(b)(1), the trial court did not "determine [whether] a material issue exist[ed] other than conduct conforming with a character trait" that would have supported admission of the evidence, and, if so, whether the probative value of the evidence was outweighed by the "danger of unfair prejudice." *See* Tenn. R. Evid. 404(b)(2) and (3). Our Supreme Court has recently observed that a reviewing court will not consider whether evidence is inadmissible under Rule 404(b) where the defendant did not request a Rule 404(b) hearing at trial or in the motions before the trial court. *State v. Jones*, 151 S.W.3d 494, 498 n.3 (Tenn. 2004). This Court has also previously concluded that a "defendant may not base his objection to the admission of evidence on relevance at trial and then base his argument on another ground, such as violation of Rule 404(b), Tenn. R. Evid., on appeal." *State v. Korsakov*, 34 S.W.3d 534, 545 (Tenn. Crim. App. 2000) (citing *State v. Miller*, 668 S.W.2d 281, 285 (Tenn. 1984)). Thus, Defendant has waived his argument on this basis. *See* Tenn. R. App. P. 36(a).

The State argues that defense counsel's question during Officer McKenzie's cross-examination as to whether she had taken Defendant's statement was a classic example of "opening the door." Relying on *State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004), the State contends that the prosecutor properly clarified Officer McKenzie's testimony during redirect examination that the statement was taken in connection with an unrelated matter. Defendant's counsel explained in the brief that he asked the question because he did not believe that Officer McKenzie had taken Defendant's statement, and that he subsequently did not object to the prosecutor's follow-up question because he did not want "to draw any further attention to the matter." Generally, "'[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissable evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'" *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (citations omitted). The doctrine's application, however, is "limited by 'the necessity of removing prejudice in the interest of fairness.'" *Id.* (quoting *Crawford v. United States*, 198 F. 2d 976, 979 (D.C. Cir. 1952)).

The State relied in large part on Defendant's statement to Sergeant Berryman to support Defendant's convictions. Officer McKenzie's testimony left the jury with the impression, without further clarification, that Defendant actually made two statements, and it was unclear whether this second statement, which was not introduced into evidence, was made in connection with the murder in Tennessee. Based on our review, we conclude that the State's clarification of Officer McKenzie's testimony during cross-examination was proper. Moreover, a defendant "'will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct.'" *Robinson*, 146 S.W.3d at 493 (citations omitted). Defendant is not entitled to relief on this issue.

As noted above, Defendant did not object on relevancy grounds to the State's witnesses referring to Defendant's "detention" in Mississippi. *See State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000)(Failure to make a contemporaneous objection to testimony waives

appellate consideration of the issue). Defendant argues, however, that Sergeant Berryman's more specific references to his arrest were unfairly prejudicial. The State argues that any unfair prejudice arising out of these references was dispelled by the trial court's curative instruction, which was requested and approved by defense counsel.

At the conclusion of Sergeant Berryman's direct examination, Defendant requested a hearing out of the presence of the jury and voiced his objections to Sergeant Berryman's references to Defendant's arrest in Mississippi. At Defendant's request, the trial court agreed to give a curative instruction. Defendant then asked the trial court to wait and provide the instruction "just in the [trial court's] instructions . . . before we give closing arguments." Defendant subsequently agreed that the trial court's proposed instruction on the issue was "curative."

It has long been the rule in Tennessee that "limiting instructions can cure an error in the trial of a case, even one involving reference by a witness to a prior crime in which the defendant was involved, unless real doubt is raised as to whether the cautionary instruction was effective." *State v. Scruggs*, 589 S.W.2d 899, 900 (Tenn. 1979). The jury is presumed to follow the trial court's instruction. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Based upon our review of the record, the trial court's curative instruction was sufficient to correct any possible prejudice that resulted from Sergeant Berryman's references. Defendant is not entitled to relief on this issue.

## VI. Lesser Included Offenses

Defendant argues that the trial court erred in failing to instruct the jury on voluntary manslaughter as a lesser included offense of felony murder. Prior to the submission of the trial court's instructions to the jury, Defendant orally requested on the record that the trial court provide an instruction on the lesser included offense of voluntary manslaughter. Defendant contended that the evidence was sufficient to support such an instruction based on Defendant's statement that he and the victim had been seeing each other socially, that there were signs of a struggle in the victim's daughter's bedroom, and that Defendant said that the victim said she was going to shoot him right before he discharged his weapon. The trial court responded:

Well, I understand your argument [counsel], but under the law as I understand it to be, voluntar[y] manslaughter is not an included offense for murder during the perpetration of a felony because of the elements of the offense of voluntary manslaughter, and frankly, I don't find that there is any basis to charge that based on the proof that we have in the record.

The State argues initially that Defendant has waived this issue for failure to comply with the requirements of Tennessee Code Annotated section 40-18-110. Pursuant to these statutory provisions, the trial court's failure to instruct the jury on a particular lesser included offense may not be raised on appeal or in a motion for new trial unless the defendant requests in writing that the trial court provide such an instruction prior to the trial court's charge to the jury. Tenn. Code Ann. § 40-18-110(c). However, a panel of this Court has recently concluded that "an oral request for an

-16-

instruction of a lesser included offense which is made on the record in a felony case where by law a court reporter must be present to prepare a verbatim record of the proceedings, satisfies the 'in writing' requirement of Tennessee Code Annotated section 40-18-110 so long as the oral request is made prior to the trial court's charge to the jury . . . ." *State v. Ronald Eugene Hall and Henry Lee Dixon*, No. M2003-02326-CCA-R3-CD, 2005 WL 292432, at *6 (Tenn. Crim. App., at Nashville, Feb. 8, 2005), *no perm. to appeal filed*. Thus, we will address Defendant's issue on the merits.

The trial court instructed the jury on second degree murder, reckless homicide and criminally negligent homicide as lesser included offenses of felony murder in both counts of the indictment. It is well established that these three offenses are lesser included offenses of felony murder. *See State v. Ely*, 48 S.W.3d 710, 721-22 (Tenn. 2001). Although *Ely* did not specifically address whether voluntary manslaughter is a lesser included offense of felony murder, this Court has previously held that it is. *State v. Marlon Marktavias Fitzgerald*, No. W2001-03096-CCA-R3-CD, 2003 WL 261940, at *9 (Tenn. Crim. App., at Jackson, Feb. 7, 2003), *perm. to appeal denied* (Tenn. July 7, 2003); *State v. Alfonzo Williams*, W2001-00452-CCA-R3-CD, 2002 WL 1482695, at *5 (Tenn. Crim. App., at Jackson, Mar. 15, 2002), *perm. to appeal denied* (Tenn. Sept. 23, 2002) (citing *State v. Daniel Wade Wilson*, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *14 (Tenn. Crim. App., at Knoxville, Aug. 2, 2001), *perm. to appeal denied* (Tenn. Mar. 11, 2002)).

If an offense is found to be a lesser included offense, we must next determine whether the evidence justified an instruction on the lesser included offense. *State v. Bowles*, 52 S.W.3d 69, 75 (Tenn. 2000). "In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such evidence." Tenn. Code Ann. § 40-18-110(a). "Whether an instruction is required depends upon the evidence, not the theory of the defense or the State." *Robinson*, 146 S.W.3d at 486 (citing *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002)); *State v. Richmond*, 90 S.W.3d 181, 188 (Tenn. 2002).

Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Defendant relies primarily on his statement to support his contention that there was sufficient evidence in the record to support a finding that he shot the victim in a state of passion produced by adequate provocation.

In his statement, Defendant said he met the victim about five days before Christmas in front of Advance Auto Parts, and their conversation led to the victim's offer to sell him her car speakers. The two continued to speak over the next few days by telephone, and Defendant eventually visited the victim in her home. Defendant said that on the night of the shooting, he called the victim, but no one answered. Defendant continued in his statement to the police:

> Then after that, after an hour went by I called again, nobody answered after several calls, and I went over to [the victim's] by myself about [eight o'clock] something that night and parked in the driveway under the shed and knocked on the door and rung

-17-

the doorbell repeatedly. No one came to the door. And I started to leave, and I turn[ed] around and then went and beat on the door and rung the doorbell. And I went to the front windows and knocked on it and went to the back window and then raised the window up and took the air conditioner out, and [the victim] said, "Who's that?" and I ran away and jumped the gate and then came back and jumped the gate again into [the victim's] yard and kept running full speed and jumped straight through the window. The victim was on the bed at first in the room I jumped into, then she rosed [sic] up from the floor from beside the bed and walked away to the den. I walked behind her and she said, "I'm fixin [sic] to blow [your] ass off" and I shot her repeatedly and walked back to the room and got the speakers.

Defendant said that the victim told him she was going to shoot him, and he fired his gun five or six times at the victim as she walked away from him into the den. Based on the foregoing, and viewing the evidence liberally in the light most favorable to the existence of the lesser included offense, we conclude that the evidence was sufficient to warrant an instruction on voluntary manslaughter.

We conclude, however, that the trial court's failure to instruct the jury on voluntary manslaughter was harmless error. Our supreme court has found harmless error where the jury was instructed on at least one lesser included offense, and the jury convicted on the indicted greater offense. *State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998) (holding failure to instruct on voluntary manslaughter as a lesser included offense of first degree murder was harmless error where jury convicted on first degree murder and declined to convict on second degree murder). The trial court instructed the jury on second degree murder, reckless homicide and criminally negligent homicide in the case *sub judice*. The jury chose to convict Defendant of the greater offense of first degree felony murder. Based upon our review of the record, we conclude that the failure to instruct the jury on voluntary manslaughter did not affect the outcome of the trial, and the error, if any, was harmless beyond a reasonable doubt. *State v. Allen*, 69 S.W.3d 181, 189 (Tenn. 2002).

## VII. Prosecutorial Misconduct

Defendant argues that the prosecutor improperly made inflammatory statements and injected his personal opinion into his closing arguments in the guilt phase of the trial and the sentencing phase. The State argues that Defendant did not object to the prosecutor's argument, and the issue of prosecutorial misconduct is thus waived for purposes of appeal. Although defense counsel did not object to the prosecutor's statement at the time the statements were made, the issue of prosecutorial misconduct was raised in Defendant's motion for new trial. *See* Tenn. R. App. P. 3(e).

Rule 3(e) of the Tennessee Rules of Appellate Procedure provides, in pertinent part:

Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties, or

-18-

counsel . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Rule 36(a) of the Tennessee Rules of Appellate Procedure also provides that relief may not be granted to a party who fails to take whatever action is reasonably available to prevent or nullify the harmful effect of the error. Thus, "relief may not be granted in contravention of the province of the trier of fact," and failure to present an issue to the trial court, therefore, will typically not merit appellate relief. *See* Tenn. R. App. P. 3 and 36 Advisory Commission Comments. Specifically, failure to object to a prosecutor's alleged improper comments typically results in a waiver on appeal of any complaint concerning the prosecutor's comments. Tenn. R. App. P. 36(a); *State v. Thornton,* 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green,* 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little,* 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992).

Nonetheless, issues that rise to the level of plain error lie within the sound discretion of the appellate court and may be considered: (1) to prevent needless litigation; (2) to prevent injury to the interests of the public; and (3) to prevent prejudice to the judicial process, prevent manifest injustice, or to do substantial justice. *See* Tenn. R. App. P. 13(b); Tenn. R. Crim. P. 52(b); *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994).

Thus, if this court is to review the Appellant's claim of prosecutorial misconduct, we must do so utilizing plain error review pursuant to Tenn. R. Crim. P. 52(b) which provides: "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." However, in this case, we conclude that although certain remarks by the prosecutor during closing argument were improper, the nature and context of the comments do not rise to the level of plain error.

Closing argument is a valuable privilege for both the State and the defendant, and our courts have generally extended counsel wide latitude in arguing before the jury. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994). Consequently, trial judges are also accorded wide discretion in their control of closing argument, and this discretion will not be disturbed on appeal in the absence of abuse. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975); *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). Closing argument, however, "must be temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts or the law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). Specifically, "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *Goltz*, 111 S.W.3d at 6 (citations omitted). Nor should the prosecutor "use arguments calculated to inflame the passions or prejudices of the jury." *Id.* (citations omitted).

If a prosecutor's argument is found to be improper,

-19-

the established test for determining whether there is reversible error is whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment. *Harrington v. State*, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965). In measuring the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see also State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

*Id*. at 5-6.

## A. Closing Argument at Trial

Defendant argues that the prosecutor interjected his personal opinion into his closing argument when he told the jury,

[p]rosecutors are people, too. I'm loud. I rant and I rave, and I'm frustrated, thirty years of dealing with this, and I'm not the most sophisticated human being in the world, and yeah, I am mad, but I'm a human being, too. I don't want innocent people in the penitentiary. That's just not right. . . . What we ask you to do is to watch over us, watch over the prosecution, do just what [defense counsel] said to do. That's what he's here for. It's what you're here for, is to watch over us.

Although a prosecutor must not express a personal belief or opinion, whether the prosecutor's comments qualify as such often depends upon the specific terminology used. For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion. *United States v. Stulga*, 584 F.2d 142 (6th Cir. 1978). Thus, it is not necessarily improper each time the prosecutor uses the word "I" or "we." *See State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *129 (Tenn. Crim. App., at Knoxville, June 28, 2002), *perm. to appeal denied* (Tenn. Feb. 18, 2003). In this instance, the prosecutor did not express a personal opinion as to "the truth or falsity of any testimony or evidence or the guilt of the defendant." *Goltz*, 111 S.W.3d at 6. The prosecutor, albeit phrasing his argument in the first person, referred to something said by defense counsel. As previously noted, there was no contemporaneous objection to the prosecutor's statement. What was impliedly stated by defense counsel is not included in the record. It is Defendant's responsibility to insure that the appellate record contains all relevant portions of the trial court proceedings. The prosecutor's comments, taken in context, were not improper.

The prosecutor's description of Defendant as a "back-shooting woman killer," however, was improper. It is improper for the prosecutor to use epithets to characterize the defendant. *Cauthern*, 967 S.W.2d at 737. Looking at the statement in context, the prosecutor commented,

[t]he first element, "That the defendant unlawfully killed the alleged victim." Any question about that? Any question about it being unlawful, a back-shooting woman killer? That's who you're looking at, folks. That's not rhetoric from [the prosecutor]. That comes from the medical examiner. Where [did] gunshot wound A go? Where did it enter her body? In her back. Where did gunshot B and C go? In her back. You got the wound chart.

The prosecutor then continued with his argument noting that "you saw where these bullets went in her, and I'm sorry but when you – I ain't sorry either. This is a back-shooting woman killer."

The prosecutor, of course, may comment on the evidence presented at trial and the reasonable inferences which may be drawn therefrom. However, phrasing evidentiary comments in the form of an epithet "so as potentially to appeal to [the] jury's bias and passion is improper." *Id*. Nonetheless, based on the facts and circumstances of the case and the relative strength of the State's case-in-chief, we conclude that the prosecutor's statements do not affirmatively appear to have affected the verdict. *See* Tenn. R. Crim. P. 52(a).

The next set of challenged comments occurred during the State's rebuttal closing argument. Defense counsel argued during closing argument that the State failed to present any expert testimony to explain the trajectory of the bullets found in the victim's home, pointing out that "if he came through the window and shot [the victim] in the hallway, how was a case shelling behind a speaker across the room near the front of the house, two of them, and a bullet fragment." In rebuttal, the prosecutor stated,

[t]here was one bullet shell casing found in the . . . hallway. That's what the defendant said. He said he fired the first shot in the hallway. Then he went into the den. Now, I guess he's got us. We can't tell you about how far a .380 hull is going to fly, what angle it's going to fly when it's fired from its gun . . . whether [Defendant] was holding it like this . . . whether he had [the gun] in his left hand or his right hand, so I guess you['ve] got to turn him loose because we didn't bring somebody in here to show you to an exact science where his hand was when he fired those shots and those hulls were ejected. And I'm going to tell you one reason we didn't do it is because that person doesn't exist. That's [sic] not a science to tell you how and how far these shells are going to go. Nobody knows that. Because they're ejected, who knows, one's going to go twenty feet, one's going to go eighteen, one's going to go three. . . . He moves his hand, and it goes up it hits a wall, a ceiling.

Later, in response to the portion of Defendant's statement in which he said, "and I pray to the Lord that I will get a chance to be with my son before he get[s] older," the prosecutor stated in rebuttal, "I got news for you, [Defendant], a lot of fathers spend New Year's Eve with their sons." The prosecutor also pointed out that Defendant did not say in his statement that he wished the victim was not dead. Instead he said, "I wish at this moment I had never thought about shooting her. . . ." The prosecutor responded in rebuttal argument, "Thank you for sharing that with us, [Defendant].

Come on, come on, she's dead, [Defendant]. It's your time to share the responsibility and assume all of the responsibility, not just part of it, and not just weak excuses."

During closing argument, defense counsel focused on the internal inconsistencies in Defendant's statement when compared to the State's evidence, as well as the inconsistency between Defendant's demeanor, which the police described variously as calm, quiet and cooperative, with the personality of someone who would do "this ghastly thing." The prosecutor's comments as to how far the spent bullet shells traveled when ejected from Defendant's gun or how Defendant was standing when he shot his weapon, although offered as speculation, border closely on impermissible comments on evidence not in the record. Additionally, the prosecutor's comments which were addressed to Defendant personally instead of the jury served only to inflame the jury. Based on our review of counsels' closing arguments, however, the prosecutor's comments in rebuttal were for the most part in response to defense counsel's points of contention during his closing argument and were not so inflammatory as to render the proceedings fundamentally unfair or unduly prejudicial. The comments thus do not rise to the level of plain error, and Defendant is not entitled to relief on this issue.

### B. Closing Argument during Sentencing Phase

At the sentencing phase, the State introduced a certified copy of Defendant's conviction in Mississippi as a statutory aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(2). The State also called the victim's daughter, Celeisia Harris, to testify concerning the impact the victim's death had on their family. For the defense, Defendant's mother, Valencia Palmer, testified as to Defendant's good qualities during childhood, and Defendant apologized to the victim's family. As statutory mitigating circumstances, defense counsel argued Defendant's lack of criminal history prior to the murder and armed robbery offenses, and the Defendant's youth at the time of the offenses. *See id*. §§ 39-13-204 (j)(1) and (7).

The prosecutor based the focus of his closing argument on the loss experienced by the victim's daughters as a result of their mother's death, stating, at one point, "[t]he perspective I see it from it is three daughters who've lost their mother. That gets to me. I don't like that." Later, the prosecutor argued:

> why should [Defendant] get parole when these young ladies back here – they're all young . . . [t]hey're going to have to suffer for the rest of their lives, not just the fact their mother died. That's bad enough, but the college educated young lady [Celeisia Harris] who was much less emotional than me about this, what did she say, that death is to be expected. It's to be dealt with. It's part of what we do, but when it comes like this, when it's murder, it's harder to deal with.

We start by noting that "[i]n the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history and physical

-22-

condition; any evidence tending to establish or rebut the aggravating circumstances in subsection (j); and any evidence tending to establish or rebut any mitigating factors." Tenn. Code Ann. § 39-13-204(c). The breadth of the statute's language embraces the introduction of victim impact evidence and prosecutorial argument on the evidence, so long as the evidence in not so "'unduly prejudicial that it renders the trial fundamentally unfair.'" *State v. Nesbit*, 978 S.W.2d 872, 889-91 (Tenn. 1998) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720 (1991)). "Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." *Nesbit*, 978 S.W.2d at 891 (citations omitted). "Similarly, while victim impact argument by the prosecution about the evidence is permissible, restraint should be exercised." *Id.* "Argument on relevant, though emotional considerations is permissible, but inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible . . . ." *Id.*

Although at times emotional, we cannot conclude that the prosecutor's comments that he felt sorry for the victim's daughters were improper "inflammatory rhetoric" when viewed within the context of his closing argument. *See State v. Thacker*, 164 S.W3d 208, 253 (Tenn. 2005) (Stating that a prosecutor's statements during closing argument that he was sad and that he felt sorry for the victim's wife, although emotional, was not improper "inflammatory rhetoric."). Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE